IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 1:16-CR-0082 |
| | : | |
| v. | : | (Judge Yvette Kane) |
| | : | |
| SCOTT LANE | : | (Electronically Filed) |

## DEFENDANT LANE'S SENTENCING MEMORANDUM

Defendant, Scott Lane, by and through his counsel, Petra K. Gross, Esquire hereby submits the following memorandum to assist this Honorable Court with sentencing.

## I.    INTRODUCTION

On January 11, 2018, Mr. Lane plead guilty to the following counts of the Superseding Indictment (Doc. 143) filed in this case: (Count 9):18 U.S.C. §2251(a), Sexual Exploitation of Children (specifically, Production of Child Pornography); (Count 10): 18 U.S.C. §2251(e), Criminal Conspiracy to Produce Child Pornography; (Count 11): 18 U.S.C. §2252(a)(2), Criminal Conspiracy to Receive and Distribute Child Pornography; (Count 12): 18 U.S.C. §2252(a)(2), Receipt and Distribution of Child Pornography; (Count 13): 18 U.S.C. §2251(e), Criminal Conspiracy to Publish a Notice or Advertisement Seeking Child Pornography;

(Count 14): 18 U.S.C. §2251(d), Publish a Notice or Advertisement Seeking Child Pornography.

The conduct at issue in this case addresses two separate timeframes, April 11, 2014 through May 11, 2016 (see Counts 11, 12, and 13) and specifically July 22, 2015 (see counts 9, 10 and 14). Counts 9, 10, 13, and 14, carry a mandatory minimum period of imprisonment of fifteen (15) years. Counts 11 and 12 require a mandatory minimum period of imprisonment of five (5) years. There is no statutory requirement for consecutive sentencing in this case. Mr. Lane is scheduled to appear before this Honorable Court for his Sentencing Hearing at **<u>10:00 a.m. on Thursday, April 1, 2021</u>**.

Mr. Lane respectfully requests that he be sentenced below the guideline range as determined by this Honorable Court after considering the Presentence Investigation Report (PSR) (Doc. 979) and the Defendant's response thereto, which is more fully set forth herein. Mr. Lane further respectfully submits that the mandatory minimum sentences at issue in this case are sufficient, but not greater than necessary, to effectuate the purposes of sentencing set forth in 18 U.S.C. §3553(a). For this reason, Mr. Lane respectfully requests that this Honorable Court impose a sentence of <u>no more than</u> two hundred and forty months (20 years) and recommend that his sentence be served at either FCI Elkton or FCI Englewood, or

in the alternative USP Marion, in the event that the Bureau of Prisons deems him ineligible for placement at FCI Elkton or FCI Englewood.

## II.    Personal History and Background

Scott Lane is 37 years old.  He is a single, gay man with no children of his own.  He is the eldest son of Michelle and Barney Lane, and older brother to Garrett and Brittney Lane.  Scott grew-up in a small farming community, with generations of his family close by.

Scott grew-up during a time when the LGBTQ+ community was only just beginning to find its voice by actively raising issues of civil rights and becoming more visible as a result of the publicity surrounding the AIDS epidemic.  During this time and as a result of the community's efforts at organization and demonstration, attacks on homosexuals increased sharply around the nation.[1]  This was the soci-political environment that permeated Scott's early years, while he was struggling with questions about his sexuality.

Growing up in Bement, IL, the only school available for the community's children, was a single building that hosted grades K – 12, all under one roof.  Around the time that Scott started high school, the violent murder of Matthew Shepard was

---

[1] https://www.nytimes.com/1986/11/23/us/violence-against-homosexuals-rising-groups-seeking-wider-protection-say.html

front page news across the country.  Matthew was a young gay man living in Wyoming who was robbed, viciously beaten, tied to a fence and left to die, simply for the crime of being gay.[2]  It was during this same time that Scott was became more certain of his sexual identity, ultimately identifying as gay, but not feeling comfortable, at the time, to come out to his family or friends.

Throughout his middle school and teenage years, Scott struggled to feel included within his small-town community, including struggling with issues of attachment to his parents. As a young child and teenager struggling with his sexual identity, Scott's lack of attachment carried into his young adult life.  These feelings of isolation are all too common for many members of the LGBTQ+ community who came of age during this same time, which resulted in many community members relying on chatrooms to meet and converse with other LGBTQ+ individuals. Such chatrooms later evolved into platforms such as Myspace and Facebook.  In his personal statement that is attached to this filing as **Addendum A**, Scott discusses the role of non-elicit chatrooms as a tool for fostering relationships with other LGBTQ+ individuals.[3]

---

[2] https://www.matthewshepard.org/about-us/our-story/
[3] See Addendum A, Personal Statement of Defendant Lane (page 3, paragraph 4)

In 2002, Scott earned his high school diploma.  Three months after graduating from high school, Scott moved to Chicago, IL, ready to start his freshman year at Loyola University.  Scott saw his move to Chicago as an opportunity to finally begin his life and an openly gay man.  It was during his freshman year at college that Scott came out to his parents.

In 2006, Scott graduated from Loyola University with a Bachelor's degree in Communications.   In 2008, Scott moved to Boston, Massachusetts.  The move was prompted by an offer of employment from Brigham and Women's Hospital in Boston, MA.  At the time, Scott knew no one in the Boston area, but his interest in the work that he would be doing in the Hospital's fundraising department gave him the courage to take the leap.  A few years later, Scott transitioned to a career in Donor Relations and Fundraising for a University, using the skills and knowledge that he had learned in his position at Brigham and Women's Hospital.  Scott's first position was with his alma mater, Loyola University.

In 2011, Scott moved to New York, New York.  It was an opportunity for professional advance that saw Scott, once again, uproot himself for a new city and a new life.  Scott had received a job offer from Pace University, located in the borough of Manhattan.  Within the first few months of moving to NYC, Scott was already

beginning to foster relationships with new friends and neighbors, that continue to this day.

At the time of his arrest, Scott was working at Pace University, as Executive Director of Donor Relations and Fundraising.  After three years at the University, he was promoted to this role as a result of his work ethic and professionalism. Scott's work at Pace University also earned him an offer from New York University ("NYU") to work in NYU's medical center, a coveted role in the fundraising community.  Scott had just accepted the position with NYU the day before his arrest in this matter.

Scott was arrested on April 12, 2016, and has remained incarcerated at various facilities since that date.  Following his involvement in the July 22, 2015 incident, Scott continued about his normal routine of working and spending time with his community of neighbors and friends for the nine months leading up to his arrest.  Of note for Scott is that he, unlike some of his co-defendants,[4] never revisited the Application A chatroom either before or after July 22, 2015.  The live-feed at issue

---

[4] ***United States v. Heatherly, et al***, 2021 WL 126987 (3rd Cir. 2021)(Forensic analysis of…Staples's devices revealed that Staples had also been in the room on February 28, 2015, another time when Augusta had live-streamed his sexual abuse of his nephew…. No one would have gone back to the room innocently, thinking that the images the first time around were borderline or a fluke.) ***Id.*** at 2, 8.

in this case, was the first and only time that Scott entered that chatroom. Scott's unfamiliarity with that specific chatroom, prior to July 22, 2015, was further supported by the fact that Scott was not following "the rules of the room", by failing to have his web camera on while present in room. This rule was specifically referenced as an understanding of those who frequented this specific chatroom in the Factual Basis filed for Defendant Fensler [5] as well as the opinion issued by the Third Circuit in *United States v. Heatherly, et al*.[6]

In light of the instant offenses and circumstances thereof, Scott is fortunate to have a close assemblage of family and friends who have served as a support group for him both before and during the pending proceedings. Scott is an individual whom his friends describe as someone with "a charming dry wit,"[7] who "approaches situations and relationships with grace."[8] His brother Garrett says it best "[t]hat the amount of support [Scott] has is telling of his character and who is he as a man."[9] The relationships that Scott has developed throughout his life include individuals

---

[5] *United States v. Matthew Fensler*, 1:16-CR-82 MDPA 2017 (Doc 384)
[6] *Id.*
[7] See Addendum B, Letter from Omair H. Abbasi, M.D. (friend)
[8] See Addendum B, Letter from Cory Simonds (roommate & best-friend)
[9] See Addendum B, Letter from Garrett Lane (brother)

who have submitted letters of support on behalf of Scott for Your Honor's consideration.  See **Addendum B** to this Memorandum.

In reflecting upon his involvement with the instant offense, Scott has written a letter of his own to this Honorable Court. **See Addendum A.**  In his letter, Scott acknowledges the harm that his choices and behavior caused to the young victims at issue in this case, particularly Victim-1.  Scott acknowledges that "few things in life are guaranteed, but one that should be promised is every child have the opportunity to pursue his potential unimpeded, to pursue his happiness.  And the fulfillment of that promise should be incumbent upon every decent adult who claims to be a member of society.  And by that measure, I failed a test of basic human decency."[10] Later in his letter Scott further reflects on the depth of his failure stating that "one of the more important lessons did not register with me right away, but it's one I've grown to appreciate as time has gone by.  The unraveling of my life could have had me convinced that this case is about me.  And if I thought that, I would be do terribly incorrect.  Although I am the subject of this sentencing, this case is not about me; it is about seeking justice for a young victim." ***Id.***

---

[10] See Addendum A, Personal Statement of Defendant Lane (page 1, paragraph 4)

While the defendant's remorse is taken into account under §3E1.1, the acceptance of responsibility guideline, other courts have considered an individual's remorse in their decision to further depart from the Guideline in cases where the defendant showed remorse "to an exceptional degree".[11] One such case is *United States v. Stern*, [12] in which the District Court imposed a sentence of twelve months and one day rather than the 46-57 guideline range for the crime of possession of child pornography, based in part on a finding that the defendant's allocution was a "credible, if well-coached" statement of remorse, by an individual who also manifested self-motivated rehabilitation. The full extent of Scott's abject remorse for his conduct and crimes is outlined in his personal statement, attached to this filing as **Addendum A**.

At the time of his Sentencing Hearing, Scott will have been detained for approximately 60 months. During that time, Scott has demonstrated his desire to change, as well as his ability to do so. This personal growth is evidenced, in part, by Scott's efforts to inform his friends and family of his specific conduct and role in this case. Scott understands that only after admitting his role in the harm that was done to Victim 1, can he move forward with his own treatment and renewal of self.

---

[11] *United States v. Fagan*, 162 F.3d 1280, 1284-85 (10th Cir. 1998)
[12] *United States v. Stern*, 590 F. Supp. 2d 945 (N.D. Ohio, Dec. 19, 2008).

Scott has sought out opportunities for treatment, where available, participating in and eventually leading the structured therapeutic community at Dauphin County Prison (DCP), during his time there.   Scott served approximately eighteen (18) months at DCP, during which time Scott participated in the MENDs program. [13]   At the time that Scott was moved from DCP to Adams County Correctional Facility (ACCF), where he is currently housed, Scott had progressed to the role of facilitator, working directly and daily with the program counselor.

In his role as facilitator, Scott was responsible for managing the program and its group of participants (70 inmates).   This included: (1) leading groups, including some on his own, and filling in for the counselor when needed; (2) ensuring the participants understanding of the program's goals and requirements and assisting staff with the orderly running of the block itself; (3) helping shape the direction of the program by taking into account the ever-changing needs of the inmates and the prison's policies and processes; and (4) training two new co-facilitator who were assisting with running the program at the time that Scott was moved to DCP.

In the case of ***United States v. Irey***,[14] the District Court imposed a sentence of 210 months for a man convicted of using minors to engage in sexually explicit

---

[13] See Addendum C, DCP's Institutional Adjustment Letter for Scott Lane, dated November 16, 2020
[14] ***United States v. Irey***, 563 F.3d 1223 (11th Cir. 2009)

conduct, despite a guideline range of life and a statutory cap of 360 months.  The court's basis for the downward departure was the man's age, strong family support, service as peer mentor regarding substance abuse, quest for treatment of his pedophilia, and his low to medium risk of recidivism.  Such considerations also exist for Mr. Lane. This truth is further confirmed by the fact that throughout his nearly sixty (60) months of incarceration, Scott has not received a single behavioral write-up, let alone had an act of formal discipline lodged against him from any of the four separate facilities where he has been housed since April 2016.

### III.   Proposed Calculation of Defendant's Guideline Sentencing Range

Attorney David B. Mueller c/o The Law Offices of Colgan & Associates, LLC, on behalf of Mr. Lane, filed objections to the United States Probation Office's Presentence Report on or about November 18, 2019 (Doc 980); those objections remain outstanding.  It is Mr. Lane's position that his offense level should be ***reduced by six (6) points*** for the reasons outlined below and in addition to his Acceptance of Responsibility, which would result in a total offense level of 38 and a Guideline range of 235 - 293 months.

The United States Probation Office calculated Mr. Lane's Guideline range by organizing his charges into two separate groups as outlined below, pursuant to USSG §3D1.3(a).  Group 1 includes Counts 9, 10, 13, and 14.  Group 2 addresses Counts

11 and 12. Probation determined the offense level of the combined Groups to be 43.

Mr. Lane is a **Criminal History Category of I** (no prior arrests or convictions).

**GROUP 1** (Counts 9, 10, 13, and 14):

| | | |
|---|---|---|
| 2G2.1(a) | Base Offense Level (18 U.S.C. §2251(a)) | 32 |
| 2G2.1(b)(1)(A) | Minor <12 years | +4 |
| 2G2.1(b)(2)(B) | Sexual Conduct (18 U.S.C. 2241(a) or (b)) | +4 |
| 2G2.1(b)(4)(A) | Sadistic or Masochistic Conduct | +4 |
| 2G2.1(b)(6)(B) | Use of Computer | +2 |
| | **Subtotal:** | **46** |

**GROUP 2** (Counts 11 and 12):

| | | |
|---|---|---|
| 2G2.2 | Base Offense Level (18 U.S.C. §2251(a)) | 22 |
| 2G2.2(b)(1) | No Intent to Traffic or Distribute | -2 |
| 2G2.2(b)(2) | Minor <12 years | +2 |
| 2G2.2(b)(4) | Sadistic or Masochistic Conduct | +4 |
| 2G2.2(b)(6) | Use of Computer | +2 |
| 2G2.2(b)(7)(B) | Number of Images (150 < 300) | +3 |
| | **Subtotal:** | **31** |

| | | |
|---|---|---|
| **Multiple Count Adjustment** | | **46** |
| USSG 3E1.1(a) | Acceptance of Responsibility | -2 |

| | |
|---|---|
| **Total Offense Level** (Chapter 5 Application Note 2, Part A) | **43** |

Mr. Lane respectfully contends that the following enhancements should not be applied.

## A. Enhancement under USSG §2G2.1(b)(2): Sexual Act and Conduct

Mr. Lane respectfully contends that the four-level enhancement for Sexual

Conduct described in 18 U.S.C. 2241(a) or (b) should not be applied. There are two alternative reasons for this position.  First, the conduct actually attributable to Mr. Lane does not involve the type of force, or threat of force, necessary to trigger the 4-level enhancement.  The live event, while it does depict sexual contact, does not involve the use of force or threat of force, as defined by the Sentencing Guidelines. Therefore, the four-level enhancement should not apply.

Furthermore, assuming that the basis for the additional two-point enhancement is related to Defendant Augusta's conduct during the live-stream event of July 22, 2015, in which Defendant Augusta caused the child to perform a sexual act on himself, as well as performing a sexual act on  the child, as defined in 18 U.S.C. 2246, this conduct is distinguishable from the examples listed in the Application Note for subsection (b)(2), which states, "[t]**his provision would apply, for example, if any dangerous weapon was used or brandished, or in a case in which the ability of the minor to appraise or control conduct was substantially impaired by drugs or alcohol.**" This would leave the alternative 2-level enhancement for the commission of a sexual act or sexual contact defined in 2G2.1(B)(2)(A).

**B. Enhancement under USSG §2G2.1(b)(4)(A): Sadistic or Masochistic**

Mr. Lane respectfully contends that the four-level enhancement for material that portrays sadistic or masochistic conduct, pursuant to USSG §2G2.2(b)(4) should

13

not be applied *in addition to* the enhancement under USSG §2G2.1(b)(2).   The reason for this is that any conduct that would trigger the 4-level or the 2-level enhancement under USSG 2.1(b)(2)(B) is already accounted for by the 4-level Sadistic and Masochistic Conduct enhancement applied under USSG 2G2.1(b)(4)(A).   To add further enhancement for the same conduct would be to "double count" that conduct.

In the case of the ***United States v. Wong***,[15] the Third Circuit opined that, "[t]wo Guideline provisions that account for the same conduct constitute improper "double counting" in sentencing enhancements."   Therefore, if the basis for the sadistic conduct enhancement is the depiction of sexual activity with Victim -A, a prepubescent minor, that is of such a nature that it would cause pain to the minor, then any sexual contact has already been accounted for by that enhancement.

For this reason, Mr. Lane respectfully contends that the Sexual Conduct at issue is being "double counting", and thus a 4-point enhancement reduction is appropriate.

### C. Enhancement under USSG §2G2.1(b)(6)(B): Use of Computer

Mr. Lane respectfully contends that the two-level enhancement for the use of a computer, pursuant to USSG §2G2.1(b)(6)(B) should not be applied.   Mr. Lane

---

[15] *U.S. v. Wong*, 3 F.3d 667, 669-70 (3d Cir. 1993),

14

respectfully contends that the use of a computer is inherent in crimes involving child pornography, particularly in the instant case. District Courts have declined to apply the two-level enhancement for use of a computer under §2G2.2(b)(6), stating "these crimes always involve a computer, and therefore it is almost de facto, not de jure, but de facto become – that the use of the computer is synonymous with the crime." *U.S. v. Maguire*, 436 Fed. Appx. 74, 78 (3d Cir. 2011)(*citing* *U.S. v. Grober*, 624 F.3d 592 (3d Cir. 2010)(most enhancements are essentially inherent in the crime)). In this case, Mr. Lane would not have been able to access the chatroom in Application A without the use of computer. He therefore respectfully contends that the use of a computer is inherent in the crime, thereby making the enhancement improper.  For this reason, Mr. Lane respectfully requests this Honorable Court grant a downward departure by removing the two-level enhancement for use of a computer.

### D. Enhancement under USSG §2G2.2(b)(7)(B): Number of Images

In paragraph 15 of the Factual Basis (Doc. 821), the United States avers and Defendant Lane agreed to the following statement, "…Lane possessed and accessed multiple videos of prepubescent child pornography." (Doc. 821, pg. 14, para. 15). As examples of the *multiple* videos possessed by Lane, the United States lists "file titles" for three Audio Video Interleave files (i.e., .avi). This type of file is a

15

commonly used file format developed by Microsoft for storing both video and audio data in a single file.[16]

On or about April 7, 2017, a Computer Forensic Examination Report was created by Examiner Boos, on behalf of the United States, regarding a search that was completed of Defendant Lane's Toshiba laptop.[17]  This report categories the file titles listed in the Factual Basis as part of a "jump list" of files that were last accessed between October 11, 2012 and August 28, 2013.[18] This timeframe predates those at issue in this case.  The same report also confirms that many of those same file titles were deleted from the device between August 10, 2011 and February 8, 2013, but remained in the Recycle Bin where they were recovered.[19]

The same report makes clear that an additional 20 images and one video of suspected child pornography were recovered from the laptop's "unallocated space".[20]   Numerous Appellate Courts including: the Ninth Circuit, [21] the Sixth

---

[16] https://www.lifewire.com/avi-file-2619737

[17] US Department of Justice Criminal Division, Computer Forensic Examination, Report Date: April 7, 2017 (7 pgs)

[18] USDOJCD, Computer Forensic Examination, Report Date: April 7, 2017 (see page 2, para 5)

[19] USDOJ, Computer Forensic Examination, Report Date: April 7, 2017 (see pages 2-3, para 6)

[20] USDOJ, Computer Forensic Examination, Report Date: April 7, 2017 (see pages 2, para 4)

[21] *United States v. Flyer*, 633 F.3d 911 (9th Cir. 2011)(Unallocated space is space on a hard drive that contains deleted data, usually emptied from the operating system's trash or recycle bin folder, that cannot be seen or accessed by the user without the use of forensic software. Such space is available to be written over to store new information. Even if retrieved, all that can be known about

Circuit, [22] the Eighth Circuit,[23,] and the United States District Court for the District of Montana, [24] have all granted relief to defendants challenging the sufficiency of the evidence regarding their possession of child pornography where such files were located in the unallocated space of the defendant's device and therefore inaccessible to him/her.

As a result of the contractual nature of the Factual Basis, Defendant Lane respectfully offers this information, not to negate the three-point enhancement attributable to the number of images in his case (Factual Basis references *multiple* videos, which implies at least two videos at 75 images a piece) which is the result of the plain language of the Factual Basis signed by the parties, but rather as a point of context for the Court to better understand the scope and extent of Defendant's Lane possession of this type of material, which was limited.

## IV.   APPLICATION OF 18 U.S.C. §3553(a) FACTORS

Mr. Lane has pled guilty to Counts 9 – 14 of the Superseding Indictment (Doc. 143) pursuant to the terms of his Plea Agreement (Doc. 820), and has taken

---

a file in unallocated space is that it once existed on the computer's hard drive. All other attributes— including when the file was created, accessed, or deleted by the user—cannot be recovered.)

[22] *United States v. Keefer*, 490 Fed.Appx. 797 (6th Cir. 2012)

[23] *United States v. Huyck*, 849 F.3d 432 (8th Cir. 2017)

[24] *United States v. Carpegna*, 2013 WL 4442036 (D.Mont. 2013)

responsibility for his role in the event of July 22, 2015, as well as his possession of those images outlined in the Factual Basis (Doc. 821) that was filed simultaneously with his Plea Agreement.

Mr. Lane is the only Defendant, other than Defendant Augusta, who plead guilty to and accepted responsibility for all charges filed against him.  Mr. Lane respectfully submits that a term of imprisonment of no more than twenty years followed by a lengthy period of supervised release would be appropriate in light of the considerations set forth herein, when considered in light of the factors outlined in §3553(a)(2). [25]

Justice would not be served in this case by applying an advisory guideline sentence where it is not necessary in order to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, and to protect the public from further crimes of the defendant.[26] Accordingly, Mr. Lane respectfully requests this Honorable Court to impose a sentence of no more than twenty (20) years.

---

[25] ***U.S. v. Cooper***, 437 F.3d 324, 329 (3d Cir. 2006) (*citing **Booker***, 125 S.Ct. at 764-67)
[26] 18 U.S.C. 3553(a)(2).

## A. Low Rate of Recidivism of First-Time Offenders

When considering the question of how the sentence imposed may aid in the future deterrence of others engaging in similar conduct, the empirical data shows an unexpected result. Since the overhaul of the Sentencing Guidelines in the early 2000s, sentences for the types of crimes at issue in this matter have steadily risen from what used to be years to now decades, yet the number of child pornography offenders continues to increase. [27] In the case of **United States v. Beirermann**, the District Court remarked on this paradox stating that "there is not a sliver of evidence in this sentencing record remotely supporting the notation that harsher punishment would reduce the flow of child pornography on the Internet….This does not mean that [the defendant] should not receive a lengthy sentence for his conduct, but it does mean that the sentence should not be longer simply to satisfy an objective that, while laudable, is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of." **United States v. Beiermann**, 599 F.Supp.2d 10897, 1103-04 (N.D. Iowa 2009).

---

[27] Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research 28-29(2006)(Three National Academy of Science panels, as well as every major survey of the evidence, have reached the conclusion that there is no evidence that increases in sentence length reduce crime through deterrence).

While the conventional assumption is that the rate of recidivism (in particular, sexual recidivism) by federal child pornography offenders is high, the statistical studies that have been completed simply do not support this belief. [28]

A study published by the United States Sentencing Commission in 2012 addressed the issue of inflated recidivism rates in child pornography cases. The report notes, "The Commission's study of known recidivism by child pornography offenders suggests that the rate of known recidivism (in particular, sexual recidivism) may not be as high as commonly believed." See *United States Sentencing Commission: 2012 Report to the Congress: Federal Child Pornography Offenses.* The study reported that recidivism rates of individuals convicted of child pornography offenses have a recidivism rate of only 7.4%.

This study collected the data of 610 cases in which all offenders were convicted of a sexual offense. Of the 610 cases, only 14 offenders were arrested for or convicted of a subsequent child pornography offense, creating just a 2.3% recidivism rate specifically for child pornography offenses. Moreover, the Commission concluded that the offense and offender characteristics utilized for the study appear to have continuing relevance to current offenders. In addition to the

---

[28] See, e.g., Conference Report on S.151, PROTECT Act of 2003, 149 CONG. REC. H2950–01, H2966 (daily ed. Apr. 9, 2003) ("Recidivism is a huge problem in sexual exploitation cases.")

study completed by the United States Sentencing Commission, a study published by Harris and Hanson (2004) noted that the recidivism rate for first time offenders was significantly lower than repeat offenders during a 15-year review period. See *Sex Offender Recidivism: A Simple Question, A. Harris and R.K. Hanson* (2004).

The Commission's findings were further reinforced by a recidivism study conducted by the Federal Bureau of Prisons (BOP), based on official records (as opposed to self-report data) of a comparable number of adult male child pornography offenders. The BOP study concerned 870 production and non-production child pornography offenders released from the BOP between 2002 and 2005 and reviewed for evidence of recidivism with an average follow-up period of 3.8 years.[29]   The bottom-line for all such reports is that the statistical analysis done on the recidivism rates of sex offenders confirms that recidivism rates are *lower* for sex offenders than for the general criminal population.[30]   One reason for this is that contemporary

---

[29] Erik Faust, Cheryl Renaud & William Bickart, Predictors of Re-offense Among a Sample of Federally Convicted Child Pornography Offenders, Paper Presented at the 28th Annual Conference of the Association for the Treatment of Sexual Abusers (Oct. 2009) (Regarding general recidivism rates, 221 of the 870 (25.4%) child pornography offenders were arrested or convicted for a new criminal offense or were arrested or revoked for a "technical" violation. Fifty offenders (5.7%) engaged in sexual recidivism, which the study defined as new non-production child pornography offenses, other non-contact sex offenses, or contact sex offenses.)

[30] *See* Center for Sex Offender Management, Office of Justice Programs, *Myths and Facts About Sex Offenders* (August 2000); R.K. Hanson & K. Morton-Bourgon, *The Characteristics of Persistent Sexual Offenders: a Meta-Analysis of Sexual Offender Recidivism Studies, J. CONSUL. & CLIN. PSYCH.,Vol. 73(6), 1154(2005).*

treatment methods, particularly cognitive-behavioral therapy, have been shown to substantially reduce recidivism. [31]

Prior to his arrest in 2015, Scott had a successful career and had just accepted a new position that he had worked for years to attain through the rigors of academia and personal grit.  He was surrounded by a community of friends who had become his family, in a city that accepted him for who he was.  Those friends and his biological family continue to provide Scott with a stable support system, over the past five years. Numerous studies have shown that safety and stability, social support, steady employment, and education are essential factors in decreasing recidivism.[32]

**B. Effect of Sentence Duration on Housing and Treatment**

The B.O.P. recognizes incarcerated sex offenders as a class of inmate most likely to be placed in the Special Housing Unit (i.e., solitary confinement) for their own protection.  Sometimes such placement is voluntary due to harassment by other inmates.  Other times they are forcibly placed there by BOP staff for the same reason.

---

[31] CSOM, *Understanding Treatment for Adults and Juveniles Who Have Committed Sex Offenses* at 10-11 (November 2006); CSOM, *Myths and Facts About Sex Offenders* (August 2000).
[32] *See* R.K. Hanson & K. Morton-Bourgon, *The Characteristics of Persistent Sexual Offenders: a Meta-Analysis of Recidivism Studies*, J. CONSULTING & CLIN. PSYCH., Vol 73(6), 1154 (2005); C.A. Kruttschnitt, C.Uggen & K. Shelton, *Predictors of Desistance Among Sex Offenders: The Interaction of Formal and Informal Social Controls*, JUST.QUART., Vol. 17(1), 61(2000); J. Petersilia, WHEN PRISONERS COME HOME; PAROLE AND PRISONER REENTRY (2003).

The effects of solitary confinement, both mental and physical, are well documented.[33] A large body of research shows that solitary confinement causes adverse psychological effects and increases the risk of serious harm to individuals who experience it. [34] According to an article in the ***Journal of the American Academy of Psychiatry and the Law***, isolation can be as distressing as physical torture.[35] The regular use of such housing for sexual offenders, means that their sentences, regardless of the length, are often considered a sentence of "hard time".

These very concerns were addressed, in depth, by the District Court for the Eastern District of New York, in the case of **United States v. D.W.**[36] In that case, D.W. faced charges of Child Pornography and Sexual Abuse of Children for which his Guidelines suggested a sentence of 292-365 months.  After considering various factors including the testimony of  Phillip Wise, formerly a Warden and Assistant Director of the BOP, who testified about: (a) the assessment and designation of vulnerable inmates; (b) the risks posed to them from other inmates and staff; (c) specialized sex offender units; (d) the use of protective custody and (d) the limitations of the B.O.P.'s PREA Act pre-emptive enforcement as well as many

---

[33] https://www.medicalnewstoday.com/articles/solitary-confinement-effects
[34] https://www.annualreviews.org/doi/full/10.1146/annurev-criminol-032317-092326
[35] http://jaapl.org/content/38/1/104
[36] **United States v. D.W**., 198 F. Supp. 3d. 18 (E.D.N.Y. 2016)

23

other considerations, the District Court imposed the mandatory minimum sentence of fifteen years, in full satisfaction of all of D.W.'s charges.

Other District Court have also considered similar subjective factors such as the defendant's youthful appearance, his sexual identity [37,] and the nature of his offense [38] as reasonable considerations for imposing a substantial downward departure from the Guidelines. In the case of courts In the case of ***United States v. Shasky,*** [39], Defendant Shasky was a homosexual state trooper of diminutive statute and weight, was granted a departure upon conviction for receiving material via computer involving pornographic images of minors.  The primary basis for the District Court's departure in his sentence was the defendant's unusual susceptibility to abuse in prison and his extraordinary post-offense efforts at rehabilitation.  Of note is the fact that the physical description of Defendant Shasky, his sexual orientation and his efforts at treatment and recovery mirrors those of Mr. Lane.

---

[37]***United States v. Lara***, 905 F.2d 599 (2d Cir. 1990) (departure from 10 to 5 years upheld for defendant whose youthful appearance and bisexuality made him particularly vulnerable to victimization, a factor not adequately considered by the Guidelines); See also ***United States v. Ruff***, 998 F. Supp. 1351 (M.D. Ala. 1998) (one level departure granted to impose home detention to a slim, effeminate, and gay defendant who had previously been assaulted in prison).

[38] ***United States v. Parish***, 308 F.3d 1025 (9th Cir. 2002) (eight level departure granted in child pornography case in part because defendant had "high susceptibility to abuse in prison" due to his demeanor, his naivete, and the nature of the offense); ***United States v. Wilke***, 995 F. Supp. 828 (N.D. Ill. 1998) (testimony by prisoner-turned-professor persuaded court that defendant's appearance and conviction of sex offense involving juveniles subjected him to physical abuse in prison and warranted 4-level departure).

[39] ***United Sates v. Shasky***, 939 F. Supp. 695 (D. Neb. 1996)

24

In an effort to address this well-known concern, the Federal Bureau of Prisons created the Sex Offender Management Program (SOMP) as a solution to sex offender management issues. It is an institutional designation which means that the prison has a more robust Psychology Department, a Sex Offender Treatment Program (either residential or non-residential), and a higher percentage of sexual offenders in the general population.

The treatment program offered by the BOP for inmates considered low to moderate risk offenders who have been convicted of sexual offense crime is the Non-Residential Sexual Offender Treatment Program (SOTP-NR).[40]   Successful completion of the SOTP-NR requires approximately five hundred (500) hours of coursework that is completed at a rate of four (4) to six (6) hours a week, over a period nine (9) to twelve (12) months.  Inmates are ordinarily placed in the SOTP-NR during the last 36 months of their sentence and are prioritized by release date. Placement at a facility that offers this program requires that the participate have no more than twenty years left to serve of their sentence.

The SOTP-NR was designed to conform to the characteristics of sex offender treatment programs with proven effectiveness in reducing re-offense as demonstrated by outcome research. These characteristics include: 1) stratification of

---

[40] https://www.bop.gov/inmates/fsa/docs/evidence_based_recidivism_reduction_programs.pdf

treatment into separate tracks for high and low/moderate risk offenders; 2) targeting empirically demonstrated dynamic risk factors; and 3) training and oversight to ensure fidelity with the program model. This same treatment model is also offered by a variety of providers throughout Pennsylvania[41] and the country, as an out-patient service available for parolees upon their release from the B.O.P. This is particularly true for Scott, an individual with no prior criminal history and no institutional write-ups who has demonstrated a strong potential for rehabilitation, as evidenced by his inalienable success in the MENDs program at DCP.

### Dr. Ward

In preparation for his Sentencing Hearing, Mr. Lane was evaluated by Dr. Andrew Ward, Ph.D. Dr. Ward is a licensed psychologist who, prior to entering private practice, was employed as by the Federal Bureau of Prisons as the Coordinator for FCI Elkton's Sex Offender Management Program.  Dr. Ward was retained by defense counsel for the purpose of completing a psycho-sexual evaluation of Mr. Lane. The primary purpose of said evaluating was for Dr. Ward to assess Mr. Lane's risk of recidivism and his correlating treatment and housing

---

[41]https://www.soab.pa.gov/ForTreatmentProviders/Documents/Treatment%20Provider%20Listing.pdf

recommendations within the B.O.P. Dr. Ward's Curriculum Vitae and his Evaluation of Mr. Lane are submitted as **Addendums D** and **E** to this Memorandum.

Most notable from Dr. Ward's assessment of Mr. Lane is his conclusion that Scott has a low to moderate risk of reoffending in the future, which will make Scott eligible for placement in one of the BOP's Sex Offender Management Program. Dr. Ward recommends that Scott be placed in such a facility and that he completes the Sex Offender Treatment Program.

In the case of *United States v. Beiermann*, Judge Bennett, opinioned that a defendant such as Scott who have been "convicted of a child pornography offense [and whom] has a low potential for recidivism, particularly where that low potential is well informed by expert evaluations and the defendant's post-arrest conduct, the defendant has no significant prior criminal history, and where the defendant appears genuinely remorseful about his crimes and [is] aware of the harm that they cause, several courts have found little need to impose a full guideline sentence to protect the public." *United States v. Beiermann*, 599 F.Supp. 2d 1087, 1112 (N.D. Iowa 2009).

Similarly, In the case of *United States v. Baker*, the Seventh Circuit affirmed the District Court's sentence of 78 months for the crime of distribution of child

pornography, where Mr. Baker's guidelines called for 108-135 months, based on the
defendant's lack of criminal history, history of employment, and higher education,
as well as his age and religious background, all of which coincide with those
sentencing factors laid out in §3553(a).[42]

## Sentencing Comparisons

The following are examples of cases in which District Courts have imposed
sentences with a significant downward departure for conduct similar to or worse than
that for which Mr. Lane presents himself for judgement before this Honorable Court:

| Case Name | Citation | Charge | Factual Basis | Sentence |
|---|---|---|---|---|
| U.S. v. Himmelreich | 265 Fed.Appx. 100 (3d Cir. 2008) | 18 §2251(b) | Arranged a meeting with a minor via internet chats, but was actually undercover officer; Told police he engaged in sexual conduct with 6-year-old daughter and sent pictures of her to third party; Then found images and videos on computer, disk of photos of daughter, and chat conversations sending photos | 20 years |
| U.S. v. Leinheiser | MDPA (unreported) 2009 WL 230984 | 18 §2251 | Active abuse, transporting victims, possession of pornography involving 16-year-old. | 25 years |

---

[42] ***United States v. Baker***, 445 F.3d 987, 992 (7th Cir. 2006)

| U.S. v. Heiser | 473 Fed.Appx. 161 (3d Cir. 2012 ) | 18 § 2251(b) 2252A(a)(2) | Active abuse of daughter between ages of 9 – 15 years; possession of photos on computer of self and step daughter; photos of undress | 23.5 years |
|---|---|---|---|---|
| U.S. v. Coates | 462 Fed.Appx. 199 (3d Cir. 2012) | 18 § 2251(a) 2252A(a)(2)(B) | Possession and production of abuse of daughter (12 photos/1 video) | 20 years |
| U.S. v. Mentzer | 760 Fed.Appx. 90 | 18 §2251(a) 2252(a)(2) 2252 A(5)(B) | Created DVD of him actively abusing child (13-year-old male); had possession of images and distributed images; was HIV positive | 20 years |
| U.S. v. Naim, | 710 Fed. Appx 12 (2nd Cir.). | 2252(a)(2) 2252(a)(4)(B) 2251(e) | Submitted multiple requests to website owner to provide videos of the site owner abusing a child; 4 separate requests to see the same child; very long text chains discussing plans to watch/purchase etc. | 15 years |
| U.S. v. Bangura | 765 Fed.Appx. 928 (4th Cir. 2019) | 1591(a),(b),(c) 2423(a) 2251(a) | Sex trafficking of a 15 year old and intent to engage in prostitution; active production of child pornography; alleged mental health issues of defendant | 15.5 years |
| U.S. v. Dean | 626 Fed.Appx. 586 (6th Cir. 2015) | 2251(a) 2252(a)(4)(B) | Participated in file sharing program to store and distribute image and video files of himself and minor child; 1207 files and 1337 video files | 25 years |

## IV.   CONCLUSION

For all of the foregoing reasons, Defendant Scott Lane respectfully requests that this Honorable Court grant a variance from the advisory sentencing guidelines based on the information outlined above including, his personal history and characteristics, the need for the sentence to afford adequate deterrence and to protect the public from further crimes committed by the defendant, and the need to avoid unwarranted sentencing disparities.

Respectfully submitted,

MARTSON LAW OFFICES

Date:  March 30, 2021

*/s/ Petra K. Gross*
PETRA K. GROSS, ESQUIRE
Attorney ID# PA309131
10 East High Street
Carlisle, PA  17013
Tel. No. 717-243-3341
Fax No. 717-243-1850
*pgross@martsonlaw.com*
*Attorney for Scott Lane*

## <u>CERTIFICATE OF SERVICE</u>

I, Petra K. Gross, Esquire, Martson Law Offices/CJA Counsel, do hereby certify that I served a copy of the foregoing **Sentencing Memorandum**, via Electronic Case Filing, and/or by placing a copy in the United States mail, first class in Harrisburg, Pennsylvania, and/or by hand delivery, addressed to the following:

**Scott R. Ford, Esquire**
United States Attorney's Office
228 Walnut Street, Room 220
Harrisburg, PA 17101
(717) 221-4482
Scott.R.Ford@usdoj.gov

**Austin M. Berry, Esquire**
Child Exploitation & Obscenity Section
Department of Justice
(202) 412-4136
Austin.Berry2@usdoj.gov

Respectfully submitted,

Date: March 30, 2021

*/s/ Petra K. Gross*
PETRA K. GROSS, ESQUIRE
MARTSON LAW OFFICES
Attorney ID# PA309131
10 East High Street
Carlisle, PA  17013
Tel. No. 717-243-3341
Fax No. 717-243-1850
*pgross@martsonlaw.com*
*Attorney for Scott Lane*

31