1                  IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

UNITED STATES OF AMERICA        :
3                                :  Case No. 1:16-CR-082
                                 :
4              vs.               :  (Judge Kane)
                                 :
5  SCOTT LANE,                   :
                    Defendant    :
6

               TRANSCRIPT OF SENTENCING PROCEEDINGS
7               BEFORE THE HONORABLE YVETTE KANE
                UNITED STATES DISTRICT COURT JUDGE
8                   APRIL 1, 2021; 10:00 A.M.
                    HARRISBURG, PENNSYLVANIA
9

FOR THE GOVERNMENT:
10

     Austin M. Berry, Trial Attorney
11     United States Department of Justice
     Child Exploitation and Obscenity Section
12     1400 New York Avenue, N.W., Suite 600
     Washington, D.C.  20005
13

     Scott R. Ford, Assistant United States Attorney
14     United States Attorney's Office
     228 Walnut Street, Second Floor
15     Harrisburg, PA  17101

16  FOR THE DEFENDANT:

17     Petra K. Gross, Esquire
     Martson Law Offices
18     10 East High Street
     Carlisle, PA  17013
19

ALSO PRESENT:
20

     Crystal Bard, United States Probation Officer
21

                     Lori A. Shuey
22            Federal Certified Realtime Reporter
                 United States Courthouse
23           228 Walnut Street, P.O. Box 983
                Harrisburg, PA  17108-0983
24                   717-215-1270
               lori_shuey@pamd.uscourts.gov
25  Proceedings recorded by mechanical stenography; transcript
            produced by computer-aided transcription.

1              *THE COURT:*  Are the parties prepared to proceed in

2  *United States v. Scott Lane*?

3              *MR. BERRY:*  Yes, Your Honor.

4              *MS. GROSS:*  Yes, Your Honor.

5              *THE COURT:*  All right.  Counsel, I think we would

6  begin with the outstanding objections that are here.  I'm

7  understanding from the probation officer that one of the

8  objections is being withdrawn.  But as counsel are aware, the

9  probation officer has calculated, using an offense level of 43

10 and a criminal history category one, a guideline provision of

11 1,920 months.

12              The objections would affect that guideline

13 calculation, so I'll hear from defense counsel as to those

14 objections.

15              *MS. GROSS:*  Thank you, Your Honor.  The objections

16 that were raised were outlined by Mr. Lane's prior counsel --

17              *THE COURT:*  Right.

18              *MS. GROSS:*  -- and have been outlined in the

19 memorandum that we also filed on behalf of Mr. Lane.

20              Most notably, the objection regarding the sexual act

21 and conduct, it is our position that the points associated with

22 that should be removed from the calculation, either in whole or

23 in part, as a result of the specific conduct alleged as it

24 relates to Scott Lane.

25              The basis for that, as outlined in the memorandum, is

1   referencing also the notes, the application note for Section --

2   Subsection (b)(2), which is discussed on Page 13 of the

3   memorandum, and also in relation to the idea of double-counting

4   the actual points that are being assessed as part of the

5   sadistic-masochistic allocation under (b)(4)(A).

6          THE COURT:  Okay.  So as I understood your objection,

7   your first one relates to the 2G2.1, use of force.

8          MS. GROSS:  Yes, Your Honor.

9          THE COURT:  And are you saying that your defendant did

10   not apply force, so the guideline doesn't apply to him, or that

11   there was no force here?

12          MS. GROSS:  Your Honor, it is that my client didn't

13   apply force, but also that the nature of the force applied was

14   not such that it should raise to the four-point level, rather

15   appropriately at the two.

16          THE COURT:  Okay.  That's the way I understood the

17   objection.  Mr. Berry, good morning.  Do you want to speak to

18   that objection?

19          MR. BERRY:  Yes, Your Honor.  I think Ms. Bard has

20   done a really, really good job of explaining why this applies.

21   I don't feel like I need to belabor that too much.

22          But I would just like to put on the record briefly

23   that the idea that this doesn't qualify as force is a little

24   surprising to me given the nature of what we see in the 22

25   minutes of the live-stream where Mr. Lane was encouraging

1    Augusta to do all sorts of terrible things to this child, which

2    Augusta then, of course, did.

3          The specific acts that are outlined there and the

4    response I think are sufficient to establish the fact that it

5    was a forceful act that this 200-pound man was doing to this

6    six-year-old boy by forcing him to engage in oral sex with

7    Augusta and digitally penetrating the boy's anus.  So all of

8    that is plenty sufficient for force.

9          In terms of the double-counting, I think -- I don't

10   remember if she put the *Clark* case from the Eighth Circuit in

11   there, but there is a case from the Eighth Circuit, *U.S. v.*

12   *Clark*, 780 F.3d 896, Eighth Circuit case from 2015, which says

13   that increases under Subsection (b)(2)(A) for sexual contact

14   and Subsection (b)(4) for S&M conduct apply to separate and

15   distinct behavior and therefore is not double-counting.

16         And so I think the force, the sexual contact, and the

17   sadistic and masochistic behavior are all distinct and should

18   all apply and that it is not double-counting.

19         *THE COURT:*  All right.  Counsel, did you want to speak

20   to that objection?  That would be to 2G2.1(b)(4)(A).

21         *MS. GROSS:*  Your Honor, in response to that specific

22   objection, the way that we had broken this down was to

23   reference the *United States v. Wong* case regarding the

24   double-counting principle just on its base for the Third

25   Circuit.

1          It is our position that the definition of the

2     sadomasochism enhancement clearly also covers the act of the

3     sexual contact that's being described, and we would just ask

4     Your Honor to consider that in deciding whether or not both

5     separate assignments should apply or if it should be simply one

6     or a two-point on the sexual contact.

7          *THE COURT:*  All right.  We have taken up these

8     objections before in the case of Sewell and O'Dell,

9     co-defendants in this case, and I have overruled the objections

10    in both of those cases.

11         Without going into a lot of detail about the

12    particular facts of this case -- I think counsel are well

13    acquainted with the facts as outlined by the probation

14    officer -- it's clear to me that there was use of force.

15         As the probation officer has outlined in her response,

16    the victim was overpowered by Mr. Augusta and forcefully pushed

17    into Augusta's lap and forced to perform oral sex on him.  And

18    then separately, following that, Mr. Augusta placed his fingers

19    in the victim's anus and then put his hands into the victim's

20    mouth.

21         I think that clearly qualifies under the definition as

22    masochistic-sadistic, and I would find that separately the

23    defendants would be entitled to the enhancements on both of

24    those based on those particular facts, and there is no issue of

25    double-counting here.

1          Additionally, counsel, there was an objection

2    regarding the 2G2.1(b)(6)(B), use of computer enhancement.

3          *MS. GROSS:*  Yes, Your Honor.  In regards to that

4    specific objection, it is our position that the nature of the

5    case before the court is such that without a computer being

6    involved, it simply could not have occurred.  It is almost, in

7    this specific fact pattern, almost an element of the crime.

8          It is for that reason we've outlined our objections in

9    detail regarding that specific enhancement on -- starting on

10   Page 14 of the memorandum.  I would defer to the court then on

11   the case law that's been provided.

12         *THE COURT:*  Mr. Berry, anything additional on that

13   point?  I know you didn't have an opportunity to brief these

14   issues because the brief was filed so late by the defendant.

15         *MR. BERRY:*  It's no problem, Your Honor.  The

16   objection itself -- the use of computer enhancement is properly

17   applied.  Just as a straight factual and legal matter,

18   obviously a computer was used.

19         I think the defense is basically making a policy

20   argument that we shouldn't be doing it anymore.  And once the

21   guidelines get revamped, then that may change to some degree,

22   but as it stands as a technical matter in terms of procedural

23   reasonableness, it should be applied.

24         And then the court, of course, if it wanted to take

25   that into consideration under a 3553(a) factor or something

 1    like that to reduce the sentence, it certainly could.

 2          And the court has certainly departed from the

 3    guidelines in other cases, other cases -- in other defendants

 4    in this case for different reasons, but it can certainly be

 5    taken into account.  But as a technical matter, it absolutely

 6    should apply.  A computer was used.

 7          And, in fact, that's how this crime was concealed.

 8    Right?  I mean, the very idea of sitting in your room in New

 9    York City and going onto the Zoom conferencing platform in

10    private and encouraging a man in Carlisle, Pennsylvania, to

11    rape his six-year-old little brother is consumed, it happens

12    because of the computer.  And so the enhancement seems valid in

13    that sense as a policy matter, but technically it applies, and

14    we should apply it here.

15          *THE COURT:*  All right.  Counsel, I have to agree with

16    Mr. Berry.  I don't think there's any legal basis to support

17    that objection.  Perhaps at some point, maybe even in the

18    context of the defendants in this case, the Third Circuit will

19    take it up and find for the defendant on that, but I agree that

20    it is a policy argument.

21          Having heard the facts in this case and how the

22    particular defendants in this case went down that dark road, I

23    think computers are very much a part of the offense, the

24    concealment, the anonymity.  There's a reason this enhancement

25    does and should apply.  So I would overrule that objection, as

1  well.

2          Having said that, counsel, as I noted earlier, we

3  begin with a guideline range of 1,920 months, I think probably,

4  except for Mr. Augusta, Mr. Berry can correct me, but that

5  might be the highest range that I have seen in this case.

6          MR. BERRY:  And I think that might be because, as you

7  may recall, Your Honor, we were set to go to trial on four

8  defendants.  Mr. Edgecombe got severed out.  Lane was still in

9  until the last minute, and he pled in January and we tried the

10  case in January, so he ultimately pled to every count in the

11  indictment and so the stacking of all that.

12          Before we go on, Your Honor, on the objections, I just

13  want to make clear, the last one about the number of images, is

14  that the one that's withdrawn?

15          THE COURT:  I believe that's correct, counsel.

16          MS. GROSS:  Yes, that's correct.

17          MR. BERRY:  I just wanted to make sure before we move

18  forward.  Thank you.

19          THE COURT:  All right.  So is there anything you want

20  to offer on your client's behalf?

21          MS. GROSS:  Yes, Your Honor, if I may.  May it please

22  the court, Scott Lane is the kind of person who people show up

23  for, and that's because Scott is the type of person who shows

24  up for them.

25          Scott is the nephew who calls, he is the son who

1    always shows up for Christmas, and he is the friend who takes

2    your phone call at 2:00 a.m. because he knows if you're

3    calling, it must make a difference.

4          There's no better testament to Scott's true nature

5    than the presence of the eleven individuals that are

6    participating remotely today from all areas across the United

7    States.  The show of support that's here for Scott ranges coast

8    to coast across the U.S.

9          Many of the people present, including friends and

10   family, have offered letters of support for Scott which were

11   referenced in the sentencing memo and filed in full in the

12   addendum that was attached thereto.

13         In addition to those letters, there are three people

14   here today who have asked to address the court on Scott's

15   behalf.  Those people are Scott's uncle, Mark Dennison, his

16   brother, Garrett Lane, and his mother, Michelle Lane.

17         May it please the court, we would ask to start with

18   the testimony of Mr. Dennison, who is appearing on the screen.

19         *THE COURT:*  All right.  Mr. Berry, as these are

20   character witnesses, I'm assuming that these witnesses do not

21   need to be sworn?

22         *MR. BERRY:*  I would like to ask them questions.  I

23   don't need them to be sworn, Your Honor.

24         *THE COURT:*  All right.  Go ahead, counsel.

25         *MS. GROSS:*  Thank you, Your Honor.  Mr. Mark Dennison,

1  could you just identify yourself on the screen for the court?

2      MR. DENNISON:  I'm right here.

3      MS. GROSS:  Thank you, sir.  And, Mr. Dennison, just

4  for the record, could you also state your relationship to Scott

5  Lane?

6      MR. DENNISON:  I am Scott's uncle.

7      MS. GROSS:  All right.  And, Mr. Dennison, I

8  understand that you had prepared a statement that you wanted to

9  make to the court today on Scott's behalf.

10     MR. DENNISON:  Yes, I have a few brief statements I'd

11  like to make, please.

12     MS. GROSS:  Please proceed.

13     MR. BERRY:  Your Honor, is there a way to get the

14  volume turned up just a little bit?

15     THE COURT:  Ms. McNew, can you help us with that?

16     MR. DENNISON:  I can speak louder if I need to.

17     THE COURT:  All right.

18     MR. BERRY:  Thank you.

19     THE COURT:  Mr. Dennison, thank you.

20     MR. DENNISON:  Good morning, Your Honor.

21     THE COURT:  Good morning.

22     MR. DENNISON:  My name is Mark Dennison.  I'm the

23  uncle of Scott, and I wanted to come on just to make a few

24  brief statements.

25         I'm here today to focus on Scott's future.  I'm aware

1    of Scott's past.  I know that Scott has pled guilty to the

2    crimes he was charged with, and by pleading guilty, I believe

3    he's taken two key steps.

4            The first step, I believe he's taken responsibility

5    for his actions.  The second step and which is most important

6    to me is, I believe he's taken that first step towards

7    rehabilitation.

8            I believe that Scott can be rehabilitated.  I believe

9    that he can go on and become a productive member of society.

10   He is loved.  He has a support system.

11           He's a very smart and talented person who I know,

12   given the opportunity, can find a place in society where he can

13   go on and make a great contribution towards society.  And

14   that's basically all I have to say, Your Honor.

15           THE COURT:  All right.  Thank you.  Mr. Berry, any

16   questions?

17           MR. BERRY:  No questions, Your Honor.

18           THE COURT:  Thank you, Mr. Dennison.

19           MS. GROSS:  Your Honor, the next character witness we

20   would ask to have testify is Scott's brother Garrett Lane.  He

21   is also appearing on screen in a blue dress shirt.

22           Garrett, could you please identify yourself for the

23   court?

24           THE COURT:  He has.  Good morning, Mr. Lane.

25           MS. GROSS:  And, Garrett, just for the record, could

1   you define your relationship to Scott?

2          MR. LANE:  Yes, ma'am.  I'm Scott's brother, younger

3   brother.

4          MS. GROSS:  Thank you, Mr. Lane.  And, Mr. Lane, I

5   understand that you have a statement that you wanted to provide

6   to the court today?

7          MR. LANE:  Yes, ma'am.

8          MS. GROSS:  Please proceed.

9          MR. LANE:  Your Honor, first off, thank you for

10  providing me with the opportunity to address the court.  I'm

11  going to start off by addressing Scott's support system.

12          As you can see, there are a number of people who

13  support Scott in spite of his conviction.  This just gives you

14  a -- excuse me.  This gives you a glimpse as to the kind of man

15  that Scott is and the lasting effect that he has on people that

16  he meets.

17          It's been about five years since he -- since we

18  started this process, and we're not going anywhere.  Scott has

19  people to lean on not only now, but when he gets out, as well.

20          Scott, he's admitted to his wrongdoing and has vowed

21  to do better.  He is ashamed of some of the actions that he's

22  had, but he's not a shameful person.

23          He was a productive member of society prior to July,

24  2015, and I have no doubt that he will again be a productive

25  member of society.  His passion, his persistence, and his

1    ability to persevere are all attributes and abilities of a

2    successful person that add to the production of society.  He

3    will find new passions, and I will be there when he does.

4           And I'll leave you with this, Your Honor, I'm pleading

5    for some sort of clemency with his sentencing because a mistake

6    does not define a man.  It is the man's response to his

7    mistakes in which he must be defined.  I love you, Scott.

8    Thank you.

9           MS. GROSS:  Thank you, Mr. Lane.

10          THE COURT:  Mr. Berry, anything for Mr. Lane?

11          MR. BERRY:  No, Your Honor.

12          THE COURT:  Thank you, Mr. Lane.

13          MS. GROSS:  Your Honor, and then, finally, we would

14   like to present the testimony of Scott's mother, Michelle Lane.

15   I believe she is appearing in the dark image on the screen.  I

16   believe she's having a video issue with her phone.

17          THE COURT:  All right.

18          MS. GROSS:  Mrs. Lane, are you able to hear me and can

19   you identify yourself for the court?

20          MR. LANE:  She was having troubles with the

21   technology, so I'll see if I can't steer her in the right

22   direction really quick.

23          MRS. LANE:  Can you hear me now?

24          MS. GROSS:  Yes, ma'am.  Thank you.

25          MRS. LANE:  Okay.  Sorry.  Can you see me?

1         MS. GROSS:  Ma'am, because I can't physically see you

2   and the court can't physically see you, can you please state

3   your name and your relationship to Scott?

4         MRS. LANE:  My name is Michelle Lane, and I'm Scott's

5   mom.

6         MS. GROSS:  Thank you, ma'am.  Ma'am, it's my

7   understanding that you had prepared a statement for today to

8   read to Judge Kane on behalf of Scott.

9         MRS. LANE:  I have some notes, yes.

10        MS. GROSS:  All right.  Please feel free to begin when

11  you're ready.

12        MRS. LANE:  Okay.  I want to thank the court for

13  allowing me to speak.  First off, I want to thank the attorney,

14  Petra, for getting us to this point.  It's been a long, winding

15  road, but you did it, and we thank you for helping my --

16  helping our son along the way.  That means the world to us.

17        I want to address the letter that Scott wrote to his

18  father and I.  I'm sure it was probably the hardest letter that

19  Scott has ever written.  His words actually gave me comfort.

20  He told me what had occurred, and that was difficult to grasp,

21  but he, like other people said, has taken responsibility.

22        He is not that person.  Scott is not that person.  I

23  don't know what happened.  Like I said, his words gave me

24  comfort in the letter.

25        I want to emphasize to Scott that he gives everyone

1   around him credit, but he doesn't take credit enough for

2   himself.  Scott has worked very hard for what he has done in

3   his life and accomplished.  He has never taken any handouts,

4   never complained, paid for his own schooling.  He's done

5   everything on his own.

6         I remember when Scott was young, he liked putting

7   puzzles together.  And he'd dump the puzzles -- or his dad

8   dumped the puzzles in the middle of the floor and there were

9   like a thousand pieces there, and Scott took the time, put

10  every one together, all the puzzles together.

11        And it just shows you that -- my point is, Scott can

12  and does adapt to any and all circumstances.  He doesn't allow

13  things to get in his way, and he accomplishes his goals and

14  what needs to be done.

15        I admire Scott.  I look up to him.  He's his true self

16  and he has set his goals and he lived his life the way he

17  wanted to.  He was happy.  I was happy for him.

18        I just want to let the court know that Scott is a

19  wonderful son and I love him very much and he's a great person.

20  And I also love my other son Garrett, who has been a rock

21  during this time for all of us.  Thank you for allowing me to

22  speak, and I'm sorry.

23        *MS. GROSS:*  Thank you, Mrs. Lane.

24        *MR. BERRY:*  Nothing, Your Honor.

25        *THE COURT:*  All right.  Thank you, Mrs. Lane.  No

1    questions.

2              *MS. GROSS:*  Your Honor, we have no further testimony

3    to offer.  Just briefly in summation, as the court is aware

4    from the letters that were submitted, the testimony that's been

5    provided today, Scott's conduct on July 22nd, 2015, what he is

6    here today to be held accountable for, is something that was

7    outside his normal behaviors, his normal tendency as defined by

8    his family and those closest to him.

9              It is something where Scott had never returned back to

10   that room after that date, nor had he been there before.  It is

11   something that, to his credit, as far as this case, that his

12   friends are still describing him as someone with empathy for

13   others ready to help.

14             He does have an allocution that he would like to

15   present to the court live today in court, and we have made our

16   request for a sentence of no more than 20 years to be served at

17   the facilities identified in the sentencing memorandum, either

18   FCI Elkton or the FCI facility in Colorado, as well.

19             Those two facilities specifically, as well as Marion,

20   which is located in Illinois, offer the sexual offender program

21   that Scott will be required to participate in as part of any

22   BOP placement, and for those reasons, we're recommending those

23   facilities.

24             *THE COURT:*  All right.  Thank you.  Mr. Lane.

25             *THE DEFENDANT:*  Thank you.  Your Honor, in the event

1   the victim ever becomes aware of my remarks today, I want him

2   to know that I was wrong.  I have no excuses, and I'm sorry.  I

3   am profoundly sorry for what's happened to him and for my role

4   in it.

5          Few things in life are guaranteed, but one that should

6   be promised is every child have the opportunity to pursue his

7   potential unimpeded, to pursue his happiness.  And the

8   fulfillment of that promise is incumbent upon every decent

9   adult who claims to be a member of society.  And by that

10  measure, by that test of basic human decency, I failed.

11         Every day I hope he has the resources he needs to lead

12  a meaningful, fulfilling, and joyful life.  I hope he grows up

13  not afraid to ask for help.  I hope he and not his abusers has

14  final say over his future.  Every day I hope his best triumphs

15  my worst.

16         On July 22nd, 2015, I contributed to the suffering of

17  an innocent child, destroyed the life I worked so hard to

18  build, and caused unimaginable grief, sorrow, and anger for

19  family, friends, and complete strangers.

20         For the last five years, I've read and reread in

21  absolute horror and disgust the words I typed that day.  You

22  will undoubtedly hear them repeated later this morning, and

23  they are no easier to hear today than they were five years ago.

24  I stand in shame knowing that these cruel utterances were typed

25  with my hands.

1          After learning the extent to which the victim suffered

2     beyond the events of July, 2015, my role in the harm only

3     served to further enhance the shame and regret of my conduct,

4     particularly my words.

5          Although I am the subject of today's hearing, this

6     case has never been about me.  It has always been about seeking

7     justice for a young victim.

8          I'm sure that there's nothing I'll say this morning

9     that you have not previously heard, so what I'm here to do

10    today is make you a promise, a promise that you will not meet

11    another defendant who will work as hard and as tirelessly as me

12    to atone for his actions.

13         I've never been a quitter, and anytime I've put my

14    mind to something, I've succeeded.  My life has been defined by

15    hard work and perseverance, lessons passed from my parents and

16    their parents and values shared with those closest to me.

17         During this process, I've been fortunate to be

18    supported and lifted up by family and friends.  Their support

19    has not been limited to phone calls, commissary, and ears to

20    listen, they actively want to see me use this time to better

21    myself.  Whether they know it or not, their generosity and love

22    have aided me in my darkest times.

23         During my incarceration, a friend with whom I'm lucky

24    enough to stay in touch revealed to me that they were, in fact,

25    a victim in their childhood.  This wasn't shared to shame me

1    further, but to help me understand the person behind the

2    computer screen.  I remain grateful for that friendship and for

3    that person's willingness to confide in me.

4          That support in particular and the hope I've received

5    in general undoubtedly speak more to the kindness of my friends

6    and family than anything I've done to deserve it, but I have to

7    believe that if I'm to be a better person on the other side of

8    this experience, I've surrounded myself with the right people.

9          The first thing I think about when I wake up and the

10   last thing I think about before I go to bed every day is this

11   case, not the daunting legal repercussions I face, but the

12   moral implications of my behavior.  I know I am so much better

13   than what my actions may indicate.

14         I remain deeply disturbed by my morally bankrupt

15   behavior, and the only thing that matches the depth of my

16   sorrow is my resolve to be a better man today and every day

17   after.  As such, I see a silver lining to the lengthy delay of

18   my sentencing.

19         If this hearing happened four years ago, I'm not

20   certain these would have been the remarks I made, nor would the

21   letter I sent you be the same.  At the time I was still too

22   close to the event of my arrest.  The shock and emotions were

23   still too raw.  I had not yet processed my actions and their

24   consequences at a level that was required in order for me to be

25   properly remorseful.

1        I needed this time to listen, to learn, and to reflect

2   to truly understand what I did and witness for myself the

3   ripple effects of that behavior.

4        Since my arrest, I have strived to take advantage of

5   whatever opportunities I could give my -- I could find to give

6   myself the space and resources I needed to meaningfully

7   contribute to my recovery.

8        Shortly after my arrival at Dauphin County Prison, I

9   enrolled in one of the two therapeutic communities.  In

10  addition to regular group discussions and individual work,

11  listening to other guys talk about their struggles really hit

12  home.

13       What I quickly realized is that for the overwhelming

14  majority of men I met, they were victims long before they were

15  ever criminals.  In those moments, I again was confronted with

16  a situation where I could draw a line between my actions and my

17  victim and the potentially fraught path forward for him.

18       Throughout my incarceration, I've been fortunate to

19  have my brother and several friends send me countless books,

20  from presidential biographies to award-winning science fiction.

21  I've tried to consume works that deal with the human condition

22  and the struggles we all encounter.

23       Although not part of any official curriculum, those

24  readings have encouraged me to be more thoughtful and

25  reflective and further appreciate the nuance and complexity of

1   human existence.

2           Beyond any intellectual value, reading in general is

3   one of the best ways to develop and maintain empathy, something

4   I was sorely lacking on that fateful July day.

5           As tempting as it is, I have not wasted my time in

6   prison.  I have worked hard and reflected intensively to atone

7   for my mistakes.  I have committed myself to a daily renewal to

8   a path forward from the trauma I've caused.

9           As a result of this work, I have connected dots where

10  connections did not exist just a few years ago.  And despite

11  the good that this penitence portends, I am fully aware that it

12  is woefully inadequate to heal the wound I've inflicted.

13          What it does signify, though, that I am not beyond

14  help, I am not beyond hope.  I've learned that if one is to

15  recover from trauma, self-inflicted or otherwise, you cannot be

16  beholden to the past.

17          As painful and as deep as my behavior has cut, if I

18  let this present situation paralyze me, what hope will I have

19  for the future?  What good will I be to anyone, to myself, to

20  my family, to society?

21          Instead, I will find a way to keep one eye on the past

22  to never forget and one eye on the future and once again be the

23  person I should have been in July of 2015.

24          Before I close, I just want to acknowledge the friends

25  and family who are virtually present today, scattered across

1  the country and one across the pond.  I could not have made it

2  this far without them.

3       Although today is a sad and devastating day, I can't

4  help but be reminded of all the joys and achievements my life

5  has had because of each and every person on that screen.  Those

6  memories and feelings I will keep with me always.

7       For many people, the 40 minutes of July 22nd, 2015,

8  will negate everything I've ever accomplished and will forever

9  define my future.

10       As I stated in the beginning, countless times I've

11  read in horror at the words I typed.  Those words themselves

12  grieve me.  I joined a mob in progress and allowed myself to

13  become part of that violence.  To my utter regret, I was

14  inexcusably too weak and failed to do the right thing.  I'm

15  sorry.

16       Although I know that nothing like this will ever

17  happen again, I am fully aware that talk is cheap.  My failure

18  was too outrageous to not be doubtful.

19       So to anyone who questions my sincerity or ability to

20  be better in the future, I just ask you to consider my

21  potential.  Consider what I now understand to be the person I

22  should have been, the person I am.  I so desperately want to

23  demonstrate to you, Your Honor, that July 22nd, 2015, was not

24  the real me.

25       But until such time is possible, I will dedicate my

1    time and energy to being the best version of myself, the one

2    who has always strived, the one who has always cherished, the

3    one who has always dreamed.  Thank you.

4              *THE COURT:*  Thank you, Mr. Lane.  Mr. Berry.

5              *MR. BERRY:*  Thank you, Your Honor.  As we just heard

6    from Mr. Lane and we see in the letter that he submitted to the

7    court, Mr. Lane is an excellent communicator, a very, very

8    articulate man, very well spoken, a good command of language

9    and ideas and can convey things in a very powerful and

10   persuasive way.  His letter to the court was probably one of

11   the more articulate ones I've seen in a very long time.

12             What strikes me, though, is how -- and it's great that

13   all of the family is here and supportive of him, and what we've

14   heard is he has a great supportive structure.  And that, of

15   course, is important for a person when they're in prison and

16   when they're getting out, most especially when they're getting

17   out trying to reintegrate into society.

18             But what strikes me is that Your Honor and every

19   professional in this courtroom that has seen a lot of

20   defendants come through federal courtrooms knows that we see

21   all different kinds of defendants.

22             And we've seen defendants who came into this courtroom

23   from a very underprivileged background and circumstance.  They

24   grew up without a mom and a dad or in a single-family home

25   where one of the parents was an addict of some kind or they

1   were physically abused and they never had educational

2   opportunities.

3          And a bank robber comes into this courtroom under

4   those circumstances and you kind of go like, it's not entirely

5   surprising how they got here.  It doesn't excuse the behavior,

6   but it's certainly understandable.

7          And we look at a situation like that and we say, well,

8   that guy just didn't have the right nurture to really achieve

9   potential and to avoid a life of crime or criminal activity.

10          And you contrast that with a case like this where the

11   defense presented is, look at this great family that he comes

12   from, look at this great support network.  He is a really good

13   guy.  He's educated, he had a good job, all of those sorts of

14   things.

15          And I don't know if the position is supposed to be

16   mitigate his sentence because he's a good guy and therefore he

17   has a lot of potential, but that's sort of what it feels like.

18          And it strikes me as a little upside down to look at

19   the poor, underprivileged guy and say, you never really had

20   anything and so your sentence should be mitigated because you

21   didn't have the right nurture, and then to turn and look at a

22   defendant like Mr. Lane and say, you had great nurturing.

23   Right?

24          You've got both parents still there.  He's got a

25   brother that's supportive.  He's got all these friends and

1   family.  He grew up in a stable home environment.  He went to

2   college.  He got educated.  He had a good job after college.

3   He had career advancement.  He was making more money than the

4   agents in this case investigating him.

5            He had everything he needed to be successful and law

6   abiding in all the circumstances that we think about, and yet

7   still, despite all that nurture, he committed a horrible,

8   egregious, terrible act against a six-year-old boy.

9            And we have to keep that boy in mind.  We have to keep

10  that at the forefront.  This case is not about Scott Lane.

11  This case is about the six-year-old boy who was sexually abused

12  for the sexual gratification of many people, including that

13  man, Scott Lane.

14           We also have to keep in mind, Your Honor, that this is

15  not a one-off occasion, as the defense has tried to portray

16  this and characterize it.

17           And, again, when I go back to Mr. Lane's letter to the

18  court -- and he repeated some of those things in his allocution

19  here today and they're good points, but what strikes me is, it

20  has a lot of surface-level appeal about some of the things he

21  says, but when you drill down and get a little bit more

22  granular, there is still a lot of self-mitigation and failure

23  to accept.

24           And all three of the character witnesses that spoke

25  today talked about him taking responsibility, and certainly

1    pleading guilty days before trial is technically taking

2    responsibility at some point in the game.

3          But I think it's important to keep in mind that his

4    remorse in this case has been somewhat strategic.  Remember

5    when he was arrested, as the PSR states, they asked him, don't

6    you care about this six-year-old boy?  And he says, you know, I

7    just don't want to say anything, I can't help you, I don't know

8    the law, I'm not going to do anything to help you here.

9          There's no evidence that he had any remorse between

10   July 22nd, 2015, and when he was arrested.  There's no evidence

11   that he suddenly goes, oh, my, goodness, what was it that I did

12   yesterday on Zoom?  That was terrible, I need to report this

13   and try to get this boy some help, anonymously or otherwise.

14   He did nothing like that.

15         He writes this letter to the court in February, 2021,

16   and to his credit, he acknowledges that the delayed sentencing

17   allows him to allocute and present a version of himself that is

18   quite different than it would have been if it had been four

19   years ago, if we had sentenced him a year after he had been

20   arrested, but he's still making excuses now to the court and to

21   the psychologist who just interviewed him a few months ago.

22         And I also think it's noteworthy to say that all this

23   sort of contrition and statement of remorse is also couched in

24   the fact that still, here today, the defendant was arguing that

25   that boy was not forced.

1        And it strikes me as appalling to think that if that

2   little boy was sitting in this courtroom right now listening to

3   that defendant say, hey, I wasn't forced, I was not forced, my

4   mouth was not forced on this grown man's penis, I was not

5   forced to have an adult finger shoved in my anus, I was not

6   forced to have that finger taken from my anus and stuck in my

7   mouth, it is absolutely appalling to think that this little boy

8   was not forced.

9        And that suggests to me that maybe we're not quite

10  there, and that on the surface of his statements to the court

11  it looks good, but he's still not there.  And that's okay, he

12  doesn't have to be there right now.  He is on his way, and

13  hopefully he will get there.  But I don't want it to go

14  unstated that his remorse has been strategic and that he is

15  still shading some things.

16       So, for example, to the court he has said, in his

17  statement to you, Your Honor, I allowed others to send me

18  illegal content on, quote, a handful of occasions.  To the

19  psychologist, he said, I never sought out images of children.

20       But his factual basis alone, when you go back and look

21  at what he admitted and that what -- and not just his factual

22  basis, but the statements that he made in the Zoom room on

23  July 22nd, 2015, when he first gets in the room before he

24  realizes this little boy is about to be live-raped for him,

25  what does he say?  Anyone showing vids?  That's someone seeking

1    out contact.  He's absolutely sought it out.

2           In the factual basis, he admits that he has frequented

3    Zoom rooms on multiple occasions knowing that child pornography

4    was going to be streamed there.  The forensics from his devices

5    found videos called, Six-Year-Old Enjoys Dad's Cock, Andy,

6    Four-Year-Old Anal, and Toddler Rape, were all different titles

7    of videos that he had on his devices.

8           The forensics from his devices and the defendant's

9    sentencing memo themselves that reference that forensic report

10   acknowledge and state that as early as 2011, this type of

11   content was in there, last accessed in October, 2012 and 2013.

12          And as the psychologist says, the reason he probably

13   didn't have that many more images on his devices is because he

14   discovered the very computer platform that he argues against

15   shouldn't enhance his sentence, which is the Zoom platform

16   permitted him to access this child pornography in an on-demand

17   streaming fashion where he didn't have to have that additional

18   evidence on his device.

19          So the idea that he never sought out images and that

20   he only allowed people to send it to him on a handful of

21   occasions is just not accurate, and it is mischaracterizing

22   both his own conduct and the facts of this case.

23          In addition, he is not being entirely truthful when he

24   says to the psychologist, I'm not attracted to children and

25   images, only men.  That was the psychologist's

1    characterization, not a direct quote from the defendant.

2         But yet to Augusta, the things he said in the chat

3    room were, Fuck him, get him naked, you fuck him, fuck nephew.

4    Those are the things that this defendant said.  So the idea

5    that he's not attracted to children and images is just not

6    true.

7         In addition, in the factual basis in Paragraph 21, he

8    admitted that he was there for the child pornography, not for

9    the adults.  So this notion that he was just in this Zoom room

10   and he was really looking at the man raping the child, not the

11   child itself, is just not true.

12        To the court -- and this is similar to what I

13   mentioned a minute ago.  In his letter to the court, he says

14   July, 2015, was the first and only time I used that chat room,

15   yet in the Zoom room, as I mentioned a moment ago, his first

16   thing when he gets in there was not like, hey, what are we

17   doing in here, let's talk about NFL football, which is one of

18   his hobbies that people have talked about, but instead he says,

19   Anyone showing vids?  First thing he says after he says, 31 NYC

20   here, under his screen name NYC Perv.  He then says, Anyone

21   showing vids?

22        And then the live event happens, he says all those

23   horrible things and encourages this six-year-old to get raped,

24   and then after that is over with and after that 22 minutes of a

25   boy being lived-raped, the defendant then goes back to, Anyone

1    got any vids?  He's still looking for videos of children being

2    sexually abused.  And then, again, the forensics and the

3    factual basis show that he frequented them on multiple

4    occasions.

5            In addition, the PSR at Paragraph 26 talks about the

6    chats that this defendant had with others about sex with kids,

7    chats that happened back in 2014, well before this event in

8    2015.  And then again in Paragraph 20 of the PSR, it mentions

9    those filenames that I referenced a moment ago that were found

10   on his devices.

11           The only other thing I want to address, Your Honor, is

12   I'm on a career mission to educate everyone that will listen

13   about what recidivism really means.  And I'm not going to

14   belabor this but I would like to put it on the record at least

15   briefly, about what, when we talk about what the psychologist

16   in his risk assessments has done, as well as the defendant's

17   argument about recidivism, what recidivism means.

18           Recidivism, in all those studies, means one thing and

19   one thing only, it is the statistic by which we measure when

20   someone is caught again.  It has nothing, I mean zero, to do

21   with the likelihood that they will sexually offend against

22   another child.

23           We can't predict it.  We cannot test it, we cannot

24   research it, there are no statistics out there that says this

25   defendant has this percentage of likelihood of sexually abusing

1    another child.

2          And the reason that is is obvious.  The only way we

3    can study this sort of thing is to say, guy was arrested for

4    sex crime, went this many years and was arrested again for

5    another sex crime, therefore he committed a recidivism,

6    therefore there was recidivism.  And Your Honor knows this.

7    I'm not trying to condescend in that regard.  I just want to

8    put this on the record.

9          And so it's only about getting caught doing the same

10   thing.  We can't predict that here.  And so this Static-99 and

11   the Stable-2007 -- and Your Honor sat through a sentencing

12   hearing in another courtroom in this courthouse where we spent

13   a lot of time with a psychologist going through that sort of

14   thing, and I know Your Honor is familiar with that.

15         What I think is important here is, again, going back

16   to this defendant's education, he is extremely smart, a very

17   articulate man, and he eluded detection from law enforcement

18   and all of these people, his entire family and friend network,

19   this great support system that he has.

20         From 2011, at least, 2012, 2013, 2014, and 2015 he was

21   engaged in this type of activity, and nobody knew about it, not

22   even his closest friends and family knew about it.

23         So this idea that he will be unlikely to commit

24   another crime is really not true.  What we know is, there's a

25   low percentage that he will get caught again based upon the

1    statistics.  And I think his chances of getting caught are even

2    lower because of precisely how smart and capable he is and how

3    well he eluded detection for so long.

4          And so I don't think that's a plus in his regard.  I

5    think the fact that he has been through this process now, he

6    will only be smarter and more careful and very likely would

7    never get caught again.  And so I would just ask this court to

8    take that into consideration when thinking about the recidivism

9    aspect that has been put forth by the defense.

10          And, again, the final thing that I want to point out

11   is, again, this case is about a six-year-old little boy whose

12   life has been forever changed.  And the defendant alluded to

13   that and said some things like, you know, I hope his best is

14   better than my worst and that sort of thing.

15          And the sad fact and the reality is that all of the

16   research shows that people that have experienced six or more

17   adverse childhood events, what they call ACE's, A-C-E's, have a

18   20 -- a predicted mortality rate that is 20 years younger than

19   it otherwise would be.

20          So for a black male in the United States today who

21   might have a life expectancy of, say, 70 years, this boy will

22   now have a life expectancy of approximately 50.

23          He is expected to die at the age of 50 because of all

24   the deleterious effects of sexual abuse that occurs as a child.

25   And he is far more likely to engage in hard drugs.  He is far

1   more likely to attempt suicide.  There are all kinds of things

2   that are going to affect this boy's life for the rest of his

3   life.

4        And it was not this defendant's just 22 minutes on one

5   occasion that is somehow going to define this defendant's life.

6   He was engaged in this activity for a prolonged period of time,

7   and it culminated in the most egregious act that we know about

8   with this defendant, and this act that we know about is enough

9   for this court to sentence him to a significant sentence that

10  is in line with the other sentences this court has passed out

11  for similarly situated defendants.  Thank you.

12       *THE COURT:*  Thank you, counsel.  Ms. Gross, I

13  neglected to ask you at the outset about the presentence

14  report.  It's pretty clear from what you filed with the court

15  that you reviewed it and you had a full opportunity to comment

16  on the paragraphs that counsel has just now referenced.

17       *MS. GROSS:*  Yes, Your Honor, I agree.

18       *THE COURT:*  All right.  The court is tasked with

19  beginning with that staggering guideline range, fashioning a

20  sentence that is consistent with the other sentences imposed in

21  this case considering all of the 3553(a) factors.  As I noted

22  before, with an offense level of 43, criminal history category

23  one, the guideline range is 1,920 months.

24       I've reviewed very carefully the sentences imposed in

25  the other cases, and I think that -- I'll allow counsel an

1    opportunity to comment on this, but I think that based on the

2    participation in the offense, the defendants who are most like

3    Mr. Lane in terms of culpability would be Mr. Fensler and

4    Mr. Sewell.

5         Ms. Gross, I know you don't have the presentence

6    report of those defendants, but they are mentioned in the

7    presentence report where the conversation that occurred on that

8    July date is outlined.

9         And the reason why I selected Mr. Sewell and

10   Mr. Fensler is because they, like this defendant, were active

11   participants.  They weren't just standing by watching, they

12   were urging this 21-year-old man who, as we later learned, was

13   an abuse victim himself, to engage in this horrific conduct.

14        So that's why I selected those two, but I'm happy to

15   hear anything counsel wants to offer on that point.

16        *MR. BERRY:*  Would you like me to go first?

17        *THE COURT:*  Yes.

18        *MR. BERRY:*  Yes, Your Honor.  I think Your Honor is

19   spot-on with the analysis.  David Sewell, AKA Sex Education 8

20   to 13, was the defendant who said horrific things that were

21   quite similar to the defendant.

22        The defendant said, Fuck him, fuck nephew.  David

23   Sewell says, Rape the nigger baby.  I mean, he said just

24   horrific things that encouraged this.  And Fensler with the AKA

25   of Baby Raper Snuffer, similarly situated, and, again, the

1    chats are in there with the things that he said.

2         That encouragement, which as Your Honor may recall

3    from the trial, was paramount to this defendant.  It was

4    critically important to this defendant that he have a big

5    audience and that they had no limits.  Those were his things.

6         He wanted to know, does anybody in this room have any

7    limits, because if they do, I don't really want to be here or

8    it's going to temper what I do.  So he wanted a no-limits room,

9    and the more people he had, the better.  And the more people

10    that talked to him and chatted him up, the more encouragement

11    it gave him.  It emboldened him to commit this horrible crime.

12         And keep in mind, Your Honor, that this defendant did

13    not just comment publicly, right, in the public room when I say

14    publicly.

15         *THE COURT:*  Right.

16         *MR. BERRY:*  Publicly in this deviant sexual group, did

17    not just comment there, there are private messages that this

18    defendant sent to Augusta because he wanted that connection to

19    Augusta to further encourage it.  And so I absolutely think he

20    fits right there with Sewell and Fensler.

21         *THE COURT:*  All right.  Thank you.  Ms. Gross.

22         *MS. GROSS:*  Your Honor, well, I do absolutely,

23    obviously, understand the court's correlation between

24    Mr. Lane's statements and then those of the two identified

25    defendants.

1          The one thing that I can offer in Mr. Lane's defense

2    as far as a separating factor is that having reviewed the

3    factual bases for those two separate defendants and many of the

4    others that are involved in this case, this is the only time

5    that Mr. Lane's -- any of the forensic evidence that was

6    discussed by U.S. Attorney Berry and anything else that I'm

7    aware of that has come before this and the trial for this case,

8    this is the only time that he was in this room.

9          He was not norming with some of the things that the

10   Third Circuit doing the appeal of the two defendants that's

11   already gone up has addressed, including the fact that he

12   didn't have his camera on.  And there's nothing that supports

13   with the forensic evidence for this case that he ever went

14   back.

15         My understanding from those two specific defendants is

16   that they had previously been involved in the same chat room,

17   were familiar with Augusta.  And for that reason, I would ask

18   that Your Honor distinguish Mr. Lane from his co-defendants.

19         *THE COURT:*  All right.

20         *MR. BERRY:*  Your Honor, I just need to rebut that

21   again.  Paragraph 20 of the PSR comes from, I think, Paragraph

22   15 of his factual basis, regardless, Paragraph 20 in the PSR

23   for the record.  The defendant admitted, indeed, the forensic

24   analysis of his electronic devices revealed that Defendant Lane

25   frequented multiple, multiple Application A rooms -- now we can

1   say Zoom, it's not a secret anymore -- Zoom rooms, many of

2   which he knew streamed child pornography, period.

3        *MS. GROSS:*  Your Honor, I'm sorry, if I may, just to

4   clarify my statement, I do absolutely understand where U.S.

5   Attorney Berry is making his reference from.

6        *THE COURT:*  Right.

7        *MS. GROSS:*  My argument is based solely on the room in

8   question with the defendants at issue that are the

9   co-defendants to Mr. Lane.  That is where my argument is based.

10  And I believe, that, yes, that is the factual basis for

11  Mr. Lane.  It's also a similar factual basis for other

12  defendants in this case.

13       But we would again submit that when we're looking at

14  these co-defendants and those similar conduct words, we would

15  ask that the court distinguish Mr. Lane.

16       *THE COURT:*  All right.  Thank you, counsel.  I have

17  considered all of the 3553(a) factors beginning with the nature

18  and circumstances of the offense that bring Mr. Lane before the

19  court.

20       As we all know, in the spring of 2016, using the name

21  NYC Perv, he conspired with other men to promote the production

22  and exchange of child pornography of the very worst kind.

23       He participated in the actual sexual abuse of a

24  six-year-old boy and the live transmission of that abuse.  He

25  was not a casual observer, as some others involved in this case

1    were, but a very active participant.

2           The investigation of this case revealed that he was no

3    stranger to child pornography, that he was a collector of child

4    pornography, including pornography that depict 30 known

5    children identified by the Center for Missing and Exploited

6    Children known victims.

7           The investigation also confirms that as early as 2014,

8    he visited similar chat rooms where the sexual abuse of

9    children was discussed and images were shared.  In some of

10   those chats, he claimed to have raped a nine-year-old child,

11   and in some of those chats he actively solicited sex with a

12   child.

13          As many others in this case, the defendant stands

14   before the court with no criminal arrests or convictions.  He's

15   37 years old, college educated, very successful by all accounts

16   from a career standpoint, a lovely, supportive family, a life

17   of opportunity filled with friends, family, and good times.

18   He's not the person that we usually see in this court or any

19   other court, I'm sure.

20          The case is really tragic for Mr. Lane's family, and,

21   of course, we know the tragedy that the activity he was

22   involved with brought to the doorstep of another family.

23          The guideline range is extravagant.  It's calculated

24   the way it is because it's such an aggravated case.  There is a

25   need for something below a guideline range sentence to punish,

1   deter, promote respect for the law, reflect the seriousness of

2   the offense, and protect the public.

3          I've considered everything that counsel has said and

4   written, including the very articulate statement and letter by

5   Mr. Lane, the letters from his family and friends, and I have

6   considered, as I noted, the disparity that would result if

7   Mr. Lane were sentenced to a guideline range sentence.

8          For that reason, I am going to vary from the

9   guidelines.  I'm going to sentence Mr. Lane consistent with

10  those others who participated in this horrific crime based on

11  their involvement, and that would be Mr. Sewell and

12  Mr. Fensler.

13          Pursuant to the Sentencing Reform Act of 1984, it's

14  the judgment of the court that the defendant, Scott Lane, is

15  hereby committed to the custody of the Bureau of Prisons to be

16  imprisoned for a term of 420 months.

17          This sentence consists of 360 months on each of Counts

18  9, 10, 13, and 14 to run concurrently with each other, 60

19  months on each of Counts 11 and 12 to run concurrently with

20  each other and consecutive to the sentences imposed on Counts

21  9, 10, 13, and 14.

22          It's ordered that the defendant pay to the Clerk, U.S.

23  District Court, a special assessment of $100 on each count for

24  a total of $600, which is due immediately.

25          The court finds that the defendant does not have the

1  ability to pay a fine or an additional assessment, but he shall

2  make restitution in the amount of $50,000 to Victim 1 and

3  $476.95 to the Pennsylvania Victims Compensation Assistance

4  Program payable to the Clerk, U.S. District Court.  Payment of

5  interest is waived.

6          The restitution to Victim 1 is to be paid jointly and

7  severally with restitution that has been imposed in the cases

8  of William Chandler Augusta, Casey O'Dell, David Sewell, Moises

9  Marquez, William Staples, Paul Stamm, Dylan Heatherly, James

10  Reese, and Jason Bolden.

11          The $476.95 restitution amount is to be paid jointly

12  and severally with these defendants and also Ed Westbury.  No

13  further payment shall be required after the sum of the amount

14  actually paid by all defendants has fully covered compensable

15  losses.

16          The defendant shall forfeit to the United States the

17  defendant's interest in certain properties described in the

18  charging document.

19          During the term of imprisonment, the restitution is

20  payable every three months in an amount after a telephone

21  allowance equal to 50 percent of the funds deposited into the

22  defendant's inmate trust fund account.

23          In the event that restitution is not paid in full

24  prior to the commencement of supervised release, the defendant

25  shall, as a condition of supervised release, satisfy the amount

1   due in monthly installments of no less than $75 to commence 30

2   days after release.

3           On release from imprisonment, the defendant shall be

4   placed on supervised release for a term of 15 years on each

5   count to be served concurrently.

6           Within 72 hours of release, the defendant shall report

7   in person to the probation office in the district to which he

8   is released.

9           While on supervised release, the defendant shall not

10  commit any federal, state, or local crime, possess a dangerous

11  weapon, or unlawfully possess a controlled substance.

12          The defendant shall comply with the standard

13  conditions that have been adopted by this court and with the

14  following additional conditions:

15          The defendant must participate in a mental health

16  treatment program and follow the rules and regulations of that

17  program.  The probation officer, in consultation with the

18  treatment provider, will supervise participation in the program

19  that may include an evaluation and completion of any

20  recommended treatment.  The defendant must take all mental

21  health medications prescribed by the treating physician.

22          The defendant must cooperate in the collection of a

23  DNA sample as directed by the probation officer unless a sample

24  is collected during imprisonment.

25          The defendant must not incur new credit charges or

1   open additional lines of credit without the approval of the

2   probation officer.

3           The defendant must provide the probation officer

4   access to any requested financial information and authorize the

5   release of any financial information.  The probation office may

6   share financial information with the United States Attorney's

7   office.

8           The defendant must apply all monies received from

9   income tax refunds, lottery winnings, judgments, and/or other

10  anticipated or unexpected financial gains to the outstanding

11  court-ordered financial obligation.

12          The defendant must pay the financial penalty in

13  accordance with the schedule of payment sheets of this

14  judgment.  He must also notify the court of any changes in

15  economic circumstances that might affect his ability to pay

16  this financial penalty.

17          The defendant must comply with the registration

18  requirements of the sex offender registration agency in any

19  state where he resides, is employed, carries on a vocation, or

20  is a student and shall comply with all other requirements of

21  the Sex Offender Registration and Notification Act.

22          The defendant must not have direct contact with any

23  child he knows or reasonably should know to be under the age of

24  18 without permission of the probation officer.

25          If he does have any direct contact with any child he

1    knows or reasonably should know to be under the age of 18

2    without the permission of the probation officer, he must report

3    this contact to the probation officer within 24 hours.

4            Direct contact includes written communication,

5    in-person communication, or physical contact.  Direct contact

6    does not include incidental contact during ordinary daily

7    activities in public places.

8            The defendant must not go to or remain at any place

9    where he knows children under the age of 18 are likely to be,

10   including parks, schools, playgrounds, and child care

11   facilities.

12           The defendant must participate in a sex offense

13   specific treatment program and follow the rules and regulations

14   of that program.  The probation officer will supervise

15   participation in the program that may include an evaluation and

16   completion of any recommended treatment.

17           The defendant must submit to periodic polygraph

18   testing at the discretion of the probation officer as a means

19   to ensure that he is in compliance with the requirements of his

20   supervision or treatment program.

21           The defendant must allow the probation officer to

22   install computer monitoring software on any computer he uses.

23   To ensure compliance with the computer monitoring condition,

24   the defendant must allow the probation officer to conduct

25   initial and periodic unannounced searches of any computers

1    subject to computer monitoring.

2         These searches shall be conducted to determine whether

3    the computer contains any prohibited data prior to installation

4    of the monitoring software, to determine whether the monitoring

5    software is functioning effectively after its installation, and

6    to determine whether there have been attempts to circumvent the

7    monitoring software after its installation.

8         The defendant must warn any other people who use these

9    computers that the computers may be subject to searches

10   pursuant to this condition.

11        The defendant must submit his person, property, house,

12   residence, vehicle, papers, computers, other electronic

13   communications or data storage devices or media or office to a

14   search conducted by the United States probation officer.

15        Failure to submit to a search may be grounds for

16   revocation of release.  He must warn any other occupants that

17   the premises may be subject to searches pursuant to this

18   condition.

19        The defendant is not to have any contact with any

20   victim or any member of any victim's family.

21        The court finds that the defendant poses a low risk of

22   future substance abuse and therefore suspends the mandatory

23   drug testing requirement.

24        It's my determination that the sentence imposed is

25   sufficient but not greater than necessary to comply with the

1    provisions set forth in 18, United States Code, Section

2    3553(a)(2).

3          I note that I have considered all seven factors set

4    forth in the statute.  I recognize that the guidelines, policy

5    statements, and amendments are advisory only, and I depart from

6    the guidelines as previously noted.

7          Mr. Lane, you do have a right to appeal your

8    conviction if you believe -- I said "depart," I should have

9    said "varied" from the guidelines.

10         You do have a right to appeal your conviction if you

11   believe that your guilty plea was somehow unlawful or

12   involuntary or if you think there was some other fundamental

13   defect in the proceedings that you did not waive by entering a

14   guilty plea.  You also have a statutory right to appeal your

15   sentence under certain circumstances, particularly if you think

16   the sentence I impose is contrary to law.

17         With few exceptions, any Notice of Appeal must be

18   filed within 14 days after sentence is imposed on you.  If

19   you're not able to pay the costs of an appeal, you may ask for

20   leave to appeal in forma pauperis, and if you ask, the Clerk of

21   Court will prepare and file a Notice of Appeal on your behalf.

22         Counsel, is there anything else for the record?

23         *MR. BERRY:*  Your Honor, I apologize if I didn't hear

24   it, did you say a supervised release amount?

25         *THE COURT:*  I believe that I said 15 years, but --

1          *MR. BERRY:*  Fifteen?  Okay.

2          *MS. GROSS:*  Yes, Your Honor, that's what I have.

3          *MR. BERRY:*  Okay, great.

4          *THE COURT:*  I'm not sure I spoke it, but --

5          *MR. BERRY:*  That's consistent with what you were

6  doing, anyways, but I just wanted to make sure.  But I just

7  didn't have it noted here, and I apologize.

8          *THE COURT:*  All right.  Mr. Berry, while you're on

9  your feet, do you have any objection to the court making the

10  recommendation for facilities that counsel has requested?

11          *MR. BERRY:*  No objection to his request.

12          *THE COURT:*  All right.  Is there anything else,

13  Ms. Gross?

14          *MS. GROSS:*  No, Judge.  Thank you.

15          *THE COURT:*  Thank you, counsel.  You both did a

16  stellar job in this case.  I know it's one of the more

17  difficult cases that we've had before the court in a long time.

18  There were -- I would say it was legally and factually complex

19  and also very taxing in other ways, but you've represented your

20  clients very well, and I appreciate your input.

21          *MS. GROSS:*  Thank you, Judge.

22          *THE COURT:*  Thank you.

23      *(Whereupon, the proceedings were concluded at 11:15 a.m.)*

24

25

1                 CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4        I, Lori A. Shuey, Federal Certified Realtime Reporter, in

5   and for the United States District Court for the Middle

6   District of Pennsylvania, do hereby certify that pursuant to

7   Section 753, Title 28, United States Code, that the foregoing

8   is a true and correct transcript of the stenographically

9   reported proceedings held in the above-captioned matter and

10  that the transcript page format is in conformance with the

11  regulations of the Judicial Conference of the United States.

12        Dated in Harrisburg, Pennsylvania, this 4th day of

13  May, 2021.

14

15                          **/s/ Lori A. Shuey**
                           Lori A. Shuey
16                         Federal Certified Realtime Reporter

17

18

19

20

21

22

23

24

25